## MADDRAN *v.* MULLENDORE

[No. 68, October Term, 1954.]

*Decided February 15, 1955.*

Before BRUNE, C. J., and DELAPLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

Submitted on brief by *Francis H. Urner* and *J. Louis Boublitz* for the appellant.

Submitted on brief by *Leo H. Miller, Edwin H. Miller* and *Miller & Miller* for the appellee.

DELAPLAINE, J., delivered the opinion of the Court.

This action in tort was instituted in the Circuit Court for Washington County by Mrs. Dora Maddran, of Boonsboro, to recover for injuries from an assault and battery allegedly made upon her by Thurston B. Mullendore, a Boonsboro grocer. Plaintiff claimed that she was assaulted in the three-foot alley between her house on St. Paul Street and Junior Order Hall, which stands at the corner of Main and St. Paul Streets.

Defendant, whose grocery and meat store is on Main Street next to Junior Order Hall, has a right of way through the alley to the rear of his property. He pleaded that he did not commit the wrong alleged, and that plaintiff was indebted to him, and filed a counterclaim for plaintiff's interference with the user of his right of way, which caused him and his employees inconvenience and loss of time and money.

It was shown at the trial before a jury that from 1908 to 1918 all of the land now owned by plaintiff and defendant was owned by Samuel E. Young and wife. The property owned by defendant was conveyed by Young and wife to John J. Galor and wife in 1918. Included in the deed was a grant of a right of way "between the property known as Junior Order Hall and the property now tenanted by James E. Maddran." In 1935 Galor and wife conveyed the property, including the right of way, to Thurston B. Mullendore and Gayle Mullendore. In 1946 Thurston B. Mullendore and wife and Gayle Mullendore and wife conveyed the property to a trustee, who thereupon reconveyed it to Thurston B. Mullendore and wife.

The property now owned by plaintiff was conveyed by Young and wife to James E. Maddran and wife in 1920. The grantees acquired title to one-half of the width of the alley, subject to the right of way granted to Galor and wife. Plaintiff acquired the property in 1946.

It was undisputed that the alley had been used by Galor and wife and afterwards by the Mullendores during a period of 36 years from 1918 until 1954. It was

also admitted that coal, kerosene, and other supplies were brought through the alley to the rear of the store. In the fall of 1953, when defendant was remodeling his store, the building materials were brought through the alley. After the remodeling of the store was completed, defendant directed that quarters of beef be brought through the alley rather than through the Main Street entrance. Plaintiff, age 63, who had been living in the same house for nearly 50 years, and was now living alone, complained that blood sometimes dripped from the meat.

For at least 36 years there had been a gate at the entrance to the alley, and a key had always been available to defendant. On February 14, 1954, plaintiff put a new padlock on the gate, and did not give defendant a key. Her action precipitated the alleged assault and battery.

It appears from the record that on the morning of February 16, 1954, an employee of defendant named Summers arrived in a truck with a quarter of beef, which he had been requested to carry through the alley. Finding the gate locked, he asked plaintiff for the key. Plaintiff refused. "Call the law," she said defiantly, "and I will give it to you. Then we will know who has a right, and who don't."

Summers pulled the hasp from the gate and returned to the truck to get the meat, while plaintiff went into the house, brought a chair out of the kitchen, and carried it into the alley and placed it against the wall of her house and sat on it. Defendant then walked into the alley. Plaintiff testified that she sat on the chair because she "wanted him to prove that he had a right to go through." Defendant pushed the chair and plaintiff out of the alley, while Summers went through with the quarter of beef. There was no evidence that either of the men struck plaintiff, although the quarter of beef brushed against her right arm while her left elbow struck the wall of the house. Plaintiff was not aware of any injury to herself, although she noticed that some dirt had rubbed off the wall onto her sweater. As soon as

she was out of the alley, she said to defendant: "Look what you have done to my sweater!"

Plaintiff testified that as defendant did not look at her, she tapped him on the shoulder, but he did nothing except give her "a mean look." So she went back into the house, and the excitement was over.

Neither defendant nor Summers took the stand. When plaintiff's testimony was concluded, defendant moved for a directed verdict, and the trial judge granted the motion. Thereupon defendant non-prossed his counterclaim, and judgment was entered in favor of defendant.

After plaintiff took her appeal from the judgment, the parties stipulated that if plaintiff should prosecute her appeal successfully, defendant's counterclaim would be considered automatically refiled and restored to its original status.

Plaintiff contended that she was on her own foot and a half of the alley when she was sitting on the chair, and defendant had no right to push her out of the alley. She contended that, even if she was depriving defendant of any right, he should have applied to the Court for relief. In support of her contention she asserted: "If two men are permitted to forcibly eject an elderly woman from her property, we have departed from all of our concepts of modern civilized law and order and have reverted to the times when only the strong shall prevail."

We have not been shown any justification for plaintiff's attempt to block the passageway. It is axiomatic that the owner of a servient tenement cannot close or obstruct the easement against those who are entitled to its use in such manner as to prevent or interfere with their reasonable enjoyment. Just as the law has recognized the natural right of self-defense, for the reason that it considers the process of the courts an inadequate remedy for present injuries accompanied with force, it has likewise recognized the natural right to recover real or personal property by the mere act of the injured party, for the reason that legal process may be an inadequate remedy. In the language of Blackstone, "what-

soever unlawfully annoys or doth damage to another is a nuisance; and such nuisance may be abated, that is, taken away or removed, by the party aggrieved thereby, so as he commits no riot in the doing of it." *Blackstone's Commentaries*, book 3, chap. 1.

In the notes to *Sharswood's Blackstone*, 1877 Ed., vol. 2, page 5, it is stated: "So, as the law allows retaking of the possession of land, it also sanctions the due defense of the possession thereof; and therefore, though if one enter into my ground I must request him to depart. before I can lay hands on him to turn him out, yet if he refuse I may then push him out, and if he enter with actual force I need not first request him to be gone, but may lay hands on him immediately. * * * And though a gate, illegally fastened, might have been opened without cutting it down, yet the cutting would be lawful. However, it is a general rule that the abatement must be limited by its necessity, and no wanton or unnecessary injury must be commited."

In the case at bar the evidence indicated that plaintiff did not make any objection to defendant's use of the alley except for the carrying of meat. There was no restriction against the carrying of meat or any other commodity through the alley, and the carrying of meat did not appear to be so different from the carrying of coal and kerosene as to make it an unreasonable use of the alley. It is true that plaintiff claimed that blood sometimes dripped from the beef. But there was no evidence to show that the drops of blood caused any substantial damage. In any event, the suit now before us is not for damages to property, but for injuries caused by assault and battery.

In England it was held at common law in ancient times that any person who had the right to enter upon land could lawfully enter and use force to expel a trespasser. As the exercise of that right resulted quite frequently in tumult and breach of the peace, Parliament enacted the Statute of 5 Richard II, ch. 7, which provided: "That none from henceforth make any Entry

into any Lands and Tenements, but in case where Entry is given by the Law; and in such case not with strong hand, nor with multitude of people, but only in peaceable and easy manner." 1 *Alexander's British Statutes,* Coe's Ed., 247-255.

Although the British Statute made it a criminal offense punishable by imprisonment for any landowner to enter upon his own land in such a way as to disturb the public peace, the courts in England definitely held that where a tenant has no right to continue in possession, the landlord may expel him from the premises without process, but he should use no more force than is reasonably necessary. *Beddal v. Maitland,* L. R. 17 Ch. Div. 174; *Beattie v. Mair,* Ir. L. R. 10 C. L. 208.

It has been held by some of the courts in the United States that upon the refusal of a tenant to surrender the premises, the landlord entitled to possession must resort to the remedy given by law to secure it. But it has been held in Maryland, in accordance with the rule of the common law, that where the owner of land wrongfully held by another enters and ejects the occupant, but uses no more force than is reasonably necessary to accomplish the ejectment, he will not be liable for assault and battery, although in order to effect such ejectment it becomes necessary to use so much force as to subject him to indictment at common law for breach of the peace or under the statute for making a forcible entry. *Manning v. Brown,* 47 Md. 506, 512; *Hyatt v. Wood,* 4 Johns., N. Y., 150, 4 Am. Dec. 258; *Weeks v. Sly,* 61 N. H. 89; *Souter v. Codman,* 14 R. I. 119, 51 Am. Rep. 364; *Clark v. Keliher,* 107 Mass. 406; *Low v. Elwell,* 121 Mass. 309, 23 Am. Rep. 272; *Kellam v. Janson,* 17 Pa. 467.

The law is also established in Maryland that where anyone unlawfully obstructs an easement, a person whose rights are interfered with need not resort to an action at law for damages or a suit in equity for an injunction, but may abate the nuisance by removing the obstruction, provided that he does so in such a manner as not to disturb the public peace or to put innocent persons or

their property in peril. *Turner v. Holtzman,* 54 Md. 148, 157, 39 Am. Rep. 361; *Maryland Telephone & Telegraph Co. v. Ruth,* 106 Md. 644, 68 A. 358, 14 L. R. A., N. S., 427.

We adopt the rule of law that the intentional infliction upon another of a harmful or offensive contact or other bodily harm by a means not intended to cause death or serious bodily harm is privileged for the purpose of preventing or terminating another's intrusion upon the actor's possession of land or chattels, if (1) such intrusion is not privileged, and (2) the actor reasonably believes that the intrusion can be prevented or terminated only by the immediate infliction of the bodily harm, and (3) the means he uses are reasonable, and (4) he has first requested the other to desist from the intrusion and the other has disregarded the request, or he reasonably believes that a request will be useless, or it will be dangerous to make a request, or substantial harm will be done to the land or chattel before a request can be made. 1 *Restatement, Torts,* sec. 77.

We also adopt the rule that the privilege to intentionally inflict bodily harm upon another for the purpose of preventing or terminating the other's intrusion upon the actor's possession of land or chattels is not affected by the fact that the other reasonably but mistakenly believes that he has a right or privilege to intrude, unless the actor intentionally or negligently causes the other's mistake. 1 *Restatement, Torts,* sec. 78. But, of course, where an owner uses more force in the protection or recovery of his property than the circumstances justify, he is liable for so much of the force as is excessive. 1 *Restatement, Torts,* sec. 82.

It was urged that the question whether the force employed by defendant was excessive was a question to be decided by the jury. We fully agree that the question whether the amount of force used by a property owner in protecting or regaining his property was execssive is generally a question of fact to be determined by the jury in view of all the facts and circumstances in each

particular case. Hence, a jury, in determining whether the force used by the property owner was excessive, can take into consideration the comparative sizes, physical conditions, and ages of the parties. *Bogudski v. Backes,* 83 Conn. 208, 76 A. 540. As the kind and degree of force proper to remove a trespasser depends largely upon the conduct of the trespasser, the question whether the force was suitable and moderate in any particular case must generally be left to the jury. *Commonwealth v. Clark,* 2 Metc., Mass., 23; *Commonwealth v. Donahue,* 148 Mass. 529, 20 N. E. 171, 2 L. R. A. 623; *Commonwealth v. Wright,* 158 Mass. 149, 33 N. E. 82, 19 L. R. A. 206; *Oleson v. Pader,* 160 Wis. 473, 152 N. W. 290.

Where, however, the evidence is clear and unmistakable that the force used by the property owner in defending his property was not excessive, the trial court should so rule as a matter of law. This is true even where some injury may have been accidentally or unavoidably inflicted. A striking illustration may be seen in an Illinois case, where a burglar was caught in the act of reaching through a window, which he had broken in order to steal some valuable property. It was there held that the trial judge was justified in declaring that the stabbing of the arm and the wrist of the burglar did not constitute the use of excessive force. *Devor v. Knauer,* 84 Ill. App. 184, 25 A. L. R. 549, 550.

In the case before us there was no legally sufficient evidence that defendant inflicted any injury on plaintiff in removing her from the alley. We, of course, realize that the application of the rule as to the right of a landowner to eject a trespasser varies in that the force which would be excessive in ejecting a woman might not be excessive in ejecting a man. In other words, a man, in forcibly ejecting a woman, must have due regard for her sex, under penalty of having the force employed construed to be excessive. The rule applies to all assaults, however, regardless of the sex of the trespasser. So, where a man who inflicts injury upon a woman is not a wrongdoer and is doing an act which is not unlawful, he is not liable unless he acts maliciously.

In this case, defendant, according to plaintiff's own testimony, merely pushed plaintiff and the chair out of the way. There was no evidence whatever that defendant struck plaintiff or even that he threatened to strike her. It is true that three days after the occurrence plaintiff called to see a physician, who testified that he noticed a discoloration on the right arm and a slight abrasion on the left elbow. However, those "minor injuries," as the physician called them, were not caused by defendant in pushing her out of the alley. Plaintiff herself explained that the quarter of beef which Summers was carrying brushed against her right arm and her left arm accidentally struck the wall of her house. Thus plaintiff failed to produce any evidence that defendant applied any excessive force to eject her from the alley.

For these reasons the trial judge acted correctly in taking the case from the jury. The judgment entered on the directed verdict must therefore be affirmed.

*Judgment affirmed, with costs.*